1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

ANDREW BELL and BECKY BELL,
husband and wife,

                            Plaintiffs,

      v.

THE BOEING COMPANY,

                            Defendant.

CASE NO. 20-CV-01716-LK

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

12
13
14
15
16

      This matter comes before the Court on Defendant Boeing Company's Motion for Summary

17

Judgment; Plaintiff Andrew Bell's Motion for Summary Judgment; and the parties' responsive

18

pleadings related to these motions. *See* Dkt. Nos. 17, 23, 33, 36, 42, 43, 47, 49. For the reasons

19

discussed below, the Court grants in part and denies in part Boeing's Motion for Summary

20

Judgment and denies Bell's Motion for Summary Judgment.

21

## I.      BACKGROUND

22

      The facts of this case are lengthy, but the legal issues are simple. Boeing hired Andrew

23

Bell for a second shift position in Auburn, Washington. Bell, who lived in North Carolina at the

24

time of acceptance, packed his bags and headed to Washington. Shortly after Bell reported to work,

however, Boeing notified him of its intention to transfer him to third shift (i.e., the graveyard shift). Bell protested this shift change and requested a reasonable accommodation for an unspecified and undiagnosed sleep disorder. Although Boeing initially accommodated this disability for 30 days, it thereafter placed Bell on unpaid medical leave. Bell meanwhile failed to supply sufficient medical documentation to secure a permanent restriction exempting him from third shift. And, following a protracted medical leave of absence, Bell ceased providing the medical documentation necessary to continue short-term disability benefits. Boeing then terminated Bell for job abandonment.

<u>The Beginning: Boeing's Contingent Offer Letter</u>

Sometime in late Summer 2017, a Boeing recruiter contacted Bell about a job opportunity. Bell says that he made clear to Boeing's recruiter that he could not and would not work a third shift position. Dkt. No. 23 at 3; Dkt. No. 24-1 at 9–10, 13–14. Although he did not have a medically diagnosed sleep disorder at the time, Bell believed that he had a "problem" because he had previously fallen asleep during nightshifts.[1] Dkt. No. 18-1 at 10-12, 58–59. *See id.* at 11 ("[I]t's not like, oh, I'm getting sleepy, I'm going to—you're just—you're just out[.]"); Dkt. No. 24-1 at 10 ("I totally explained to her, you know, I fall asleep. Something happens 2:00, 3:00, I'm out. I can't work that anymore."). It does not appear that Bell explained why he required a non-graveyard shift to the recruiter. According to Bell, the recruiter assured him that the position was for second shift. And, in November 2017, Bell accepted a contingent offer of employment with Boeing for the "union-represented position of Machine Repair Mechanic A" located in Auburn, Washington. Dkt. No. 18-1 at 70, 125–26.[2]

---

[1] Bell testified during his November 15, 2021 deposition that, at the time of his hiring, he had not worked a nightshift for around ten years. Dkt. No. 18-1 at 12–13, 58.

[2] The record contains an identical offer letter, dated October 3, 2017, for the same position in Puyallup, Washington.

1    Relevant here are three provisions in Boeing's contingent offer letter. First, the letter

2    indicated that Bell would be working the second shift. Dkt. No. 18-1 at 70. Second, it notified Bell

3    that the position was "covered by a Collective Bargaining Unit Agreement" (the "CBA"). *Id.* at

4    73. The letter did not specify or otherwise identify which CBA "covered" the position.[3] Nor did it

5    include a copy of the referenced CBA or re-print any terms of that CBA. Instead, the letter

6    informed Bell that he would be provided with "[a]dditional information . . . at time of hire" or

7    "shortly after" he began his assignment. *Id.* Boeing did not provide Bell with a copy of the 308-

8    page CBA until his orientation. *Id.* at 33–34. He never asked for a copy prior to that, either. *Id*.

9    Section 5.4 of the CBA vests Boeing with the "exclusive right to assign employees to any shift."

10   *Id.* at 35–36, 180. This section further directs that "senior employees who have a shift preference

11   on file shall be given preference over junior employees who are assigned to the same job title and

12   shift, junior returning non-bargaining unit employees, *new hires*, recalls from layoff, and

13   promotional candidates for placement in openings in their job title and organization." *Id.* at 180

14   (emphasis added).

15   The third and final relevant provision of Boeing's offer letter informed Bell that relocation

16   assistance had been authorized in accordance with Boeing's US Domestic Production and

17   Maintenance Relocation Handbook. *Id.* at 70, 129–162. The Handbook specifies that employees

18   are eligible for relocation benefits only upon execution of the Relocation Repayment Agreement.

19   *Id.* at 138. An employee who accepts relocation benefits and then "voluntarily terminates

20   employment or is terminated for cause within a one (1) year period will be required to refund all

21

22   _____

     Dkt. No. 18-1 at 66–69. The letter has no material significance, and the parties offer no explanation as to why Bell did
     not accept this job. *See* Dkt. No. 23 at 4 ("It is unclear why the first offer was not accepted.").

23   [3] The CBA is between Boeing and the International Association of Machinists and Aerospace Workers. Dkt. No. 18-
     1 at 173. The CBA is dated November 2, 2008, but includes contract extensions and modification agreements from

24   December 7, 2011 and January 3, 2014. *Id.*

     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
     JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 3

of the monies spent by [Boeing], including tax gross-up." *Id.* Bell, who was living in North Carolina at the time of acceptance, executed a Repayment Agreement Form. *Id.* at 49–51, 164; Dkt. No. 23 at 3, 5. That contract echoes the Handbook's repayment conditions. Bell agreed to repay Boeing "all lump sum payments, reimbursements, recurring allowances, third party payments, and any tax gross-up amounts for Relocation Expenses" if, within twelve months of the effective date of his hire, he was "involuntarily terminated for a reason other than a reduction in work force." Dkt. No. 18-1 at 169; *see also id.* at 52. Bell thereafter amassed nearly $20,000 in relocation expenses. *Id.* at 166–68; Dkt. No. 17 at 11; Dkt. No. 24-1 at 17–18.

<u>Bell Reports for Work, Trouble Brews</u>

Although Bell accepted Boeing's offer in November 2017, he did not start his new job until April 20, 2018.[4] Dkt. No. 17 at 11–12; Dkt. No. 23 at 5. Bell spent a week in new-hire orientation before working his first shift as a Machine Repair Mechanic in the Emergent Operations - Equipment Services workgroup. Dkt. No. 17 at 12; Dkt. No. 23 at 5. There, and for the duration of Bell's employment at Boeing, James Watterson was his direct supervisor. Dkt. No. 17 at 12. Bell's time on second shift was short-lived. Although the record is unclear as to the precise timing, around mid-April 2018 the Equipment Services workgroup underwent a "staffing review," following which Boeing management determined that too many employees—particularly machine repair mechanics—had been assigned to first and second shift. *Id.*; Dkt. No. 44-1 at 4 ("I think we're getting ready to pull the trigger on shift transfers"; "[t]he two new mechanics arrive on 4/20 and will report to second shift on 4/23."). Management soon "identified" Bell and another new hire for reassignment to third shift in accordance with the terms of the CBA. Dkt. No. 17 at 13. *See* Dkt. No. 18-1 at 180 ("[S]enior employees . . . shall be given preference over . . . new hires[.]");

---

[4] Boeing agreed to delay Bell's official start date so that he could care for his wife, who underwent a medical procedure in early 2018, and provide his then-current employer with sufficient notice. Dkt. No. 17 at 10; Dkt. No. 20-1 at 2–3.

Dkt. No. 17 at 12 ("[W]hen second shift is overstaffed, and third shift is understaffed, Boeing must reassign employees from second shift to third shift according to who has the least seniority[.]").

Bell caught wind of these impending changes on the first day of the job. Dkt. No. 24-1 at 19–21. Soon thereafter he approached Watterson, who more or less confirmed the rumors and indicated that management would probably "push" Bell to third shift. *Id.* at 22. Bell protested the reassignment by informing Watterson that he could not "work third" because he had a medical condition and was specifically hired for second shift. *Id.* at 22, 24; Dkt. No. 23 at 6. Watterson responded by referencing Boeing's rights under the CBA. Dkt. No. 24-1 at 22. Bell then turned to Human Resources. Dkt. No. 24-1 at 24–25; Dkt. No. 23 at 6.

<u>Human Resources, Boeing Medical, and Bell's Accommodation Request</u>

On May 15, 2018, Bell met with Human Resources Representative Kaitlyn Parsons, during which he emphasized the terms of Boeing's offer letter and reasserted his inability to work third shift. Dkt. No. 24-1 at 25; Dkt. No. 23 at 6. Parsons indicated that she was going to "get people together" to figure out the situation. Dkt. No. 24-1 at 27–28. She also contacted the recruiter who worked with Bell to confirm that Boeing offered Bell a second shift position. *Id.* at 26–27; Dkt. No. 23 at 6. Bell was instructed to go to Boeing Medical if he wanted to request accommodation for a medical condition. Dkt. No. 24-1 at 28; *see also* Dkt. No. 17 at 13. Bell visited Boeing's Auburn Medical Clinic, where the facility nurse informed him that he would need a doctor's note to seek a disability accommodation. Dkt. No. 23 at 6; Dkt. No. 24-1 at 28.

On May 31, 2018, Bell saw Dr. Aleksandra Kardasheva at the Virginia Mason Medical Center. Dkt. No. 18-1 at 183; Dkt. No. 23 at 6. The same day, Dr. Kardasheva produced a note in which she asked that Bell be excused from working the third shift "[d]ue to a medical reason[.]" Dkt. No. 18-1 at 183. The note does not otherwise specify a medical condition or proffer a diagnosis, but states that Bell was "medically cleared to work first and second shift." *Id*. On June

7, 2018, Bell returned to the Auburn Medical Clinic and completed Boeing's Reasonable Accommodation and Health Care Provider Information Form. Dkt. No. 18-1 at 185–86. On that form, Bell characterized his "limitation" as "fall[ing] asleep after 2:00 AM" and requested that Boeing accommodate it by assigning him only to first or second shift. Dkt. No. 18-1 at 185. Bell also authorized Boeing Health Services to contact his health care provider "in order to authenticate and clarify any information provided for the purposes of evaluating [his] request for reasonable accommodation." *Id.* at 186.

On June 8, 2018, Boeing Medical faxed a copy of the signed authorization form to Dr. Kardasheva to complete the health care provider portion. Dkt. No. 17 at 13; Dkt. No. 19-1 at 25. Dr. Kardasheva completed and returned the form to Boeing on June 21, 2018. Dkt. No. 19-1 at 25–26. There she stated that Bell was "undergoing [an] additional work up to determine [the] cause for sudden 'dropping' between 2 am [and] 3 am," and listed possible causes as "narcolepsy, syncope, [or] circadian rhythm vs. vasovagal." *Id.* at 25. Dr. Kardasheva further indicated that Bell required permanent work restrictions, which would remain the case if she was unable to determine a cause for his clinical presentation. *Id.* And finally, in the section for the provider's accommodation recommendation, Dr. Kardasheva noted that she referred Bell for the following: (1) a sleep study to rule out obstructive sleep apnea and consultation with a sleep specialist for possible narcolepsy; and (2) a transthoracic echocardiogram. *Id.* Dr. Kardasheva checked "Yes" in the field asking, "If the requested accommodation cannot be provided, will the employee require medical leave of absence?" *Id.*

On June 22, 2018, Boeing Medical replied to Dr. Kardasheva with a new form detailing its own recommendations. Dkt. No. 18-1 at 188. This form, which Boeing characterizes in its summary judgment motion as a request for clarification, Dkt. No. 17 at 14, informed Dr. Kardasheva that "some modifications ha[d] been made" to her recommendation. Dkt. No. 18-1 at

188. Specifically, Boeing Medical recommended that Bell be placed on a temporary work restriction instead of a permanent restriction because the latter would be "difficult to remove." *Id.* The temporary restriction would disallow third shift work for one month "until [the] results of [Bell's] testing [were] received," at which point the restriction could be "revisit[ed]" and made "permanent in [the] future if needed." *Id.* On June 28, 2019, Dr. Kardasheva agreed with and signed the new recommendation. *Id.*

<u>Boeing Presents Bell with a Shift Transfer and Implements a 30-day Temporary Accommodation</u>

Meanwhile, on June 12, 2018, Watterson presented Bell with a "Shift Change and Temporary Move Memo." *See* Dkt. No. 24-1 at 101–02. This document notified Bell that Boeing was transferring him to third shift, effective June 25, 2018. *Id.* at 102. Bell allegedly refused to sign the document and abruptly exited Watterson's office. *Id.* at 231. That same day, Watterson completed a "New Employee Progress/Probationary Review" evaluation form in which he indicated that Bell was "[p]rogressing [s]atisfactorily." *Id.* at 233. He did, however, specify the following "issues" for Bell: (1) "[c]ell phone usage should be kept to a minimum"; (2) "[s]tart time(s) for breaks and lunches and appropriate length of time for each"; and (3) "[s]cooter safety in and around the shop." *Id.*

Watterson reviewed the evaluation form with Bell in his office. *Id.* at 231. Bell was allegedly "bombastic, loud and argumentative," and wrote in the employee comment section that he was not going to third shift. *Id.* at 231, 233. This angered Watterson. In an email to Parsons later that evening, he complained about Bell's "blatant disrespect for managerial authority" and "combative, somewhat obnoxious and belligerent, rude and disrespectful" attitude. *Id.* at 231–32. Watterson stated that although he had indicated that Bell was progressing satisfactorily in the form he completed, he could not "with a clear conscience" recommend Bell for retention following

Bell's behavior at the meeting. *Id.* at 231. Watterson further claimed that it "would be a complete disservice to Boeing, other employees, and future managers, to retain someone [who] is combative and obnoxious so early in their employment." *Id.* at 232; *see also* Dkt. No. 23 at 7–8. He also noted that Bell claimed to have "retained an attorney." Dkt. No. 24-1 at 231.

In response, Parsons scheduled a meeting "for all parties involved to sit down and discuss the situation, as well as options moving forward." Dkt. No. 18-1 at 245. And on June 20, 2018, Parsons, Bell, Bell's union business representative, Watterson, and Tom Klotz (the Disability Management Representative assigned to Bell's accommodation request) met for an "interactive discussion" about Bell's accommodation request. *Id.* at 248; *see also* Dkt. No. 17 at 14; Dkt. No. 23 at 8. There Boeing's representatives told Bell that he had to produce documentation to establish a medical need for his requested accommodation. Dkt. No. 18-1 at 248. Bell acknowledged this and informed the group that he was working with his doctor and Boeing Medical to complete the requisite accommodation forms.[5] *Id.* Bell was also told that, "because of the conflict with the CBA," Boeing could temporarily accommodate his shift preference for 30 days and would then place him on an unpaid medical leave of absence "as an accommodation" if he was unable to work third shift by July 22, 2018. *Id.* at 248; *see also id.* at 19–20; Dkt. No. 17 at 14–15. Boeing's representatives informed Bell that a permanent restriction against third shift could result in reassignment to another position. Dkt. No. 18-1 at 248; Dkt. No. 17 at 15; Dkt. No. 33 at 9. Bell indicated that he was actively pursuing "ERT" (Employee Requested Transfer) into another Boeing organization where he could work first or second shift. Dkt. No. 18-1 at 248; *see also* Dkt. No. 24-1 at 129.

---

[5] As of the June 20, 2018 meeting, Bell had provided Boeing Medical with Dr. Kardasheva's initial note establishing an unspecified "medical reason" for excusing Bell from third shift. Dkt. No. 18-1 at 183. Dr. Kardasheva did not complete the health care provider portion of the accommodation form that Boeing had faxed her on June 8, 2018 until June 21, 2018. Dkt. No. 19-1 at 25. And it was not until June 28, 2018, that Dr. Kardasheva responded to Boeing's June 22, 2018 accommodation modification form. Dkt. No. 18-1 at 188.

Several days after the meeting, Bell was summoned to the office of Frederick Bell, Watterson's manager, where he was allegedly forced to sign the shift change memorandum. Dkt. No. 23 at 9–10; Dkt. No. 24-1 at 29. A Boeing security guard stood nearby. Dkt. No. 23 at 9; Dkt. No. 24-1 at 29. Bell says that when he initially protested signing the shift memorandum, Frederick Bell demanded that he do so, or else he would be "terminated on the spot." Dkt. No. 23 at 10; Dkt. No. 24-1 at 29–30. Frederick Bell allegedly added that he would "take [Bell's] badge and have [him] walked out" of the Auburn facility. Dkt. No. 23 at 10; Dkt. No. 24-1 at 30. Bell signed the shift change memorandum but, in a hand-written note below the signature line, indicated that he "signed under threat of termination." Dkt. No. 24-1 at 30, 81; *see also* Dkt. No. 23 at 10.

<u>Boeing Places Bell on an Unpaid Medical Leave of Absence; Bell Returns to North Carolina</u>

On July 16, 2018, following an in-home sleep apnea test, Bell purchased a Continuous Positive Airway Pressure ("CPAP") machine from Virginia Mason Medical Center.[6] Dkt. No. 18-1 at 25, 202–03. The test results, which Boeing received on July 17, 2018, indicated that Bell had obstructive sleep apnea. Dkt. No. 19-1 at 30–31. Bell's 30-day temporary accommodation expired soon thereafter (July 22). Following another "[i]nteractive discussion" between Bell, Watterson, Parsons, Klotz, and Ryan Black (a shop steward) on July 20, 2018, Boeing placed Bell on an unpaid medical leave of absence, effective July 23, 2018, through August 23, 2018. Dkt. No. 18-1 at 252. Boeing informed Bell that his medical leave of absence would continue "unless and until (1) he was medically released to work third shift, (2) his medical provider determined that his restriction was permanent, or (3) he exhausted his leave of absence benefits." Dkt. No. 17 at 15. Bell packed his belongings and moved back to North Carolina. *Id.* at 15; Dkt. No. 23 at 11.

---

[6] The record is unclear as to when exactly Bell underwent this initial testing, or what the testing entailed. Records from Guilford Neurologic Associates—a North Carolina sleep clinic Bell subsequently visited—suggest that the test occurred on July 11, 2018. Dkt. No. 18-1 at 210.

On July 23, 2018, Kimberly Chu—the Auburn Medical Center nurse—contacted Dr. Kardasheva for more information about Bell's initial test results. Dkt. No. 18-1 at 200. She specifically sought "an update" on his "pending tests" so that Boeing could decide whether any additional medical restrictions were necessary. Dkt. No. 19-1 at 31. Chu also informed Dr. Kardasheva that Bell's "temporary accommodations ha[d] expired" and he was "on [a] medical leave of abscense [sic] pending the out come [sic] of the inquiry[.]" Dkt. No. 18-1 at 200–01. It is unclear whether Dr. Kardasheva ever responded to Chu. Dkt. No. 17 at 16. Internal correspondence indicates that Dr. Kardasheva asked Bell to return to the clinic for further evaluation before she was comfortable with making additional recommendations to Boeing. *See* Dkt. No. 18-1 at 200 ("Please reach out to patient and advise that I need to see him in clinic before I can make any further recommendations.").

As of July 29, 2018, Dr. Kardasheva did not "have a clinical reason for [Bell] to not be able to work a 3rd shift" because his workup was "negative so far." *Id.* Dr. Kardasheva's internal correspondence suggests that Bell contacted her office on July 30, 2018, claiming that the result of his sleep study was sufficient proof for an accommodation barring him from working third shift. *Id.* at 199. Dr. Kardasheva subsequently consulted Dr. Lauren Crowley, a fellow physician at Virginia Mason Medical Center, about whether Bell's obstructive sleep apnea provided reasonable grounds to recommend excusing him from third shift. *Id.* Both agreed that they were unsure, and on August 1, 2018, Doctor Kardasheva planned to refer Bell to a sleep clinic. *Id.*

Bell's Reasonable Accommodation Request Expires, Reed Group Takes Over

August 2018 came and went. The record is silent as to Bell's efforts to secure medical documentation during this period. Nor does it reveal whether Boeing followed up with Bell once the initial medical leave of absence period expired in late August. The next mention of any activity is September 14, 2018, when Watterson phoned Bell to notify him that he had been medically

cleared to work third shift and was expected to report to work on September 17, 2018. Dkt. No. 23 at 11; Dkt. No. 24-1 at 181. Bell in turn called Klotz, who confirmed that his reasonable accommodation request had "expired" and stated that Boeing expected his immediate return to work. Dkt. No. 23 at 12; Dkt. No. 24-1 at 179. When Bell asked why his request had expired, Klotz explained that Bell would need to consult his personal provider and Boeing Medical. Dkt. No. 23 at 12; Dkt. No. 24-1 at 179.

On September 17, 2018, Bell contacted Dr. Amir Sabzpoushan, a sleep specialist at Virginia Mason Medical Center, seeking a letter restricting him from working third shift at Boeing due to his sleep apnea.[7] Dkt. No. 18-1 at 197. Dr. Sabzpoushan spoke with Bell four days later. *Id.* at 195. During their conversation, Bell informed Dr. Sabzpoushan that he was in North Carolina. *Id.* Dr. Sabzpoushan explained to Bell that, based on the data download from his CPAP machine, either Bell was not using the machine or it was not recording data. *Id.* Dr. Sabzpoushan suggested that Bell find a sleep doctor in North Carolina for further treatment. *Id.* He never provided Bell's requested letter. Dkt. No. 17 at 16.

Bell next requested short-term disability benefits on September 24, 2018. Dkt. No. 19-1 at 33. He backdated the requested coverage to July 23, 2018. Dkt. No. 19-1 at 33. Reed Group, Boeing's medical leave administrator, began handling Bell's medical certifications and issued a letter confirming receipt of his disability claim. Dkt. No. 17 at 16; Dkt. No. 19-1 at 33. This letter set forth three items that Reed Group needed to process Bell's claim: (1) an authorization form permitting the Reed Group to obtain Bell's medical records from his provider; (2) a completed Health Care Provider Form; and (3) an attending physician's statement identifying Bell's disability. Dkt. No. 17 at 16; Dkt. No. 19-1 at 33–34.

---

[7] Although the record is unclear as to when Bell first saw Dr. Sabzpoushan, he had Bell's medical records and CPAP data by September 17, 2018. *See* Dkt. No. 18-1 at 195.

<u>Reed Group Approves Bell for Short-Term Disability Benefits</u>

Bell contacted Dr. Sabzpoushan again on October 8, 2018. Dkt. No. 17 at 16; Dkt. No. 18-1 at 193–94. This time he asked the doctor to fax his medical records to Gilford Neurologic Associates in North Carolina. Dkt. No. 17 at 16; Dkt. No. 18-1 at 193–94. There Bell saw Dr. Carmen Dohmeier "to verify to work that he has difficulty with sleep apnea" and "cant [sic] work 3rd shift." Dkt. No. 18-1 at 210; *see also* Dkt. No. 17 at 17; Dkt. No. 23 at 12. His first appointment was on October 10, 2018. Dkt. No. 18-1 at 210. Dr. Dohmeier's post-examination progress notes state that she planned to conduct a narcolepsy evaluation. *Id.* at 214. She likewise planned to inform Boeing that Bell was "for the foreseeable time not able to work night shift." *Id.* And if Dr. Dohmeier later determined that Bell had narcolepsy, he "would be exempt form [sic] night shift work." *Id.*

On October 16, 2018, Dr. Dohmeier faxed to Reed Group a completed Attending Physician's Statement of Work Capacity and Impairment form. Dkt. No. 19-1 at 53–55. In the part of the form titled "Summary of Medical Condition Impacting Work," Dohmeier included a primary diagnosis of hypersomnia and a secondary diagnosis of obstructive sleep apnea. *Id.* at 54. Dr. Dohmeier's treatment plan called for Bell's compliance with prescribed CPAP use, followed by a polysomnography test ("PSG") and a multiple sleep latency test ("MSLT") in early November 2018 to rule out narcolepsy if CPAP compliance did not help the hypersomnia. *Id.* Dr. Dohmeier indicated that Bell would return to work after the PSG and MSLT testing and was "able to work daytime shifts," but recommended he not work the night shift in the meantime. *Id.* at 55; *see also id.* at 61 ("At this time I would not consider him safe to work night shift due to his excessive sleepiness. If his excessive daytime sleepiness persists after 30 days of compliant CPAP use, I will proceed with the narcolepsy evaluation."). She did not anticipate any permanent work restrictions and believed that Bell would reach "maximum medical improvement" as soon as he used his CPAP

compliantly for 30 days, subject to the narcolepsy evaluation. *Id.* at 55. Reed Group subsequently approved Bell's leave request and short-term disability benefits through November 11, 2018.[8] *Id.* at 37.

Bell returned to Dr. Dohmeier's office on November 2, 2018, for "a compliance visit with CPAP." Dkt. No. 18-1 at 216. Following the visit, Dr. Dohmeier noted that Bell's CPAP compliance was "poor" and attributed his "sleepiness" to this "poor CPAP therapy adherence[.]" *Id.* Despite this, she decided that "since his excessive daytime sleepiness persisted after 30 days of mostly compliant CPAP use," she could "proceed with the narcolepsy evaluation." *Id.* at 220. She also noted that Bell was "immediately able to return to work for early or late shift, not third shift," *id.* at 216, and that she planned to "let Mr. Bell's employer know that he is for the foreseeable time not able to work night shifts – he is able to work daytime shifts, operate machinery and has no physical restrictions," *id.* at 220. *See also id.* at 221 ("Mr. Bell will be unable to work night shift until we have further cleared him for narcolepsy."). She referred Bell for narcolepsy testing at Guilford's Piedmont Sleep Center, which he underwent on November 7 and 8. *Id.* at 216, 222–25.

When Bell again saw Dr. Dohmeier on November 21, 2018 for a follow-up on his PSG and MSLT testing, she noted that the results were "not consistent with a diagnosis of narcolepsy" and Bell had "no additional symptoms of narcolepsy or cataplexy[.]" *Id.* at 226. Bell apparently "sabotaged" the sleep study by consuming caffeinated sodas during the testing, a discovery that caused Dr. Dohmeier to question the validity of the results. *Id.* at 226, 228. She nonetheless declined to reorder the PSG and MSLT. *Id.* at 228. Dr. Dohmeier did, however, decide to obtain an HLA[9] test, *id.* at 231, noting that the MSLT results from the early November testing "could be

---

[8] Reed Group confirmed with Bell that his short-term benefits would end on January 20, 2019, at which point he would need to seek coverage through Aetna, Boeing's long-term disability administrator. Dkt. No. 19-1 at 39.

[9] Human Leukocyte Antigen (HLA) genes play a critical role in regulating the immune system. One variation of a

consistent with idiopathic hypersomnolence," *id.* at 226. If negative, the HLA test would confirm her initial diagnosis of hypersomnia and persistent hypersomnia—a diagnosis that "would not affect [Bell's] employability or shift work capacity." *Id.* at 231. Dr. Dohmeier also prescribed Modafinil,[10] although her progress notes indicate that Bell was unwilling "to use a stimulant or near stimulant to help with third shift work." *Id.* She noted that "Mr. Bell will be unable to work night shift until we have further cleared him by HLA for narcolepsy." *Id.* Dr. Dohmeier included a letter at the end of her office visit report stating that "[h]ypersomnia can present a safety hazard and [she] would therefore recommend for Mr. Bell not to work night shift as his sleepiness will be exacerbated by these work hours." *Id.* at 232.

Bell's initial short-term disability leave expired on November 11, 2018. In a letter dated November 22, 2018, Reed Group notified Bell that it required an updated physician's statement, among other documents, to extend his short-term disability benefits. Dkt. No. 19-1 at 41–42; Dkt. No. 17 at 18. Dr. Dohmeier faxed Reed Group a completed Attending Physician's Update of Work Capacity and Impairment form on November 27, 2018. Dkt. No. 19-1 at 64–66. That document lists obstructive sleep apnea as Bell's primary diagnosis and persistent hypersomnia as his secondary diagnosis. *Id.* at 65. It also reflects his continued failure to fully comply with prescribed CPAP usage. *Id.* As for Bell's return-to-work status, Dr. Dohmeier indicated that she could not release him until she received the HLA test results in two or three business days, though she noted that Bell was "able to work any shift in [the] daytime." *Id.* at 66. Reed Group thereafter approved Bell's short-term disability leave through January 20, 2019. *Id.* at 44.

---

gene in the HLA family, *HLA-DQB1\*6:02*, "increases the chance of developing narcolepsy[.]" *See* Nat'l Inst. of Neurological Disorders & Stroke, *Narcolepsy Fact Sheet*, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Narcolepsy-Fact-Sheet.

[10] Modafinil is a central nervous system stimulant and typically serves as the "first line of treatment" for narcolepsy because it is less addictive and has fewer side effects than other stimulants. *See* Nat'l Inst. of Neurological Disorders & Stroke, *Narcolepsy Fact Sheet*, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Narcolepsy-Fact-Sheet.

Bell Stops Submitting Medical Documentation and His Short-Term Disability Leave
Expires; Boeing Terminates Bell

Dr. Dohmeier's updated physician's statement is the last medical documentation that Bell

provided to Boeing. Dkt. No. 18-1 at 43–44. He cannot recall seeking further treatment for his

sleep disorder. *Id.* at 61–63. Guilford's records do not otherwise suggest that he returned to Dr.

Dohmeier's office at any point. Bell nonetheless requested another extension of medical leave.

Dkt. No. 19-1 at 47. Reed Group responded on January 15, 2019 by reminding him of his

obligation to submit supporting medical documentation within 15 days, including a "detailed

narrative report from [his] health care provider, outlining the specific physical and/or mental

limitations and restrictions relating to [his] inability to perform [his] job functions"; "[d]escriptions

of [his] current course of treatment, frequency of visits, and specific medications prescribed";

"[d]iagnostic test results"; "[l]aboratory results"; and "[o]ffice notes." Dkt. No. 19-1 at 47–48. Bell

provided none of this.

On February 8, 2019, Reed Group denied Bell's request for additional medical leave after

he failed to submit certification. *Id.* at 50. The notice letter informed Bell that he was expected to

return to work, and failure to do so could result in "corrective action up to and including

termination of employment." *Id.* And still, Bell did not return to work, submit a new

accommodation request with supporting documentation, or—as far as the record indicates—make

any effort to resolve the issue. On March 20, 2019, Human Resources directed Watterson to contact

Bell and inform him that he needed to return to work by March 22 or Boeing would terminate his

employment. Dkt. No. 18-1 at 264. Bell allegedly "chuckled" at this warning and inquired about

his 2018 W-2 forms. *Id.* Human Resources phoned Bell for the final time on March 21 to confirm

that Boeing would discharge him the following day unless he requested leave or returned to work.

*Id.* at 269. Bell did neither. Effective March 22, 2019, Boeing terminated his employment for job

abandonment. *Id.* at 256, 258, 268–69. It also sought repayment of the $19,591.84 in relocation expenses that Bell accrued in his move from North Carolina. Dkt. No. 24-1 at 74–76, 79.

Bell Sues Boeing

In August 2020, Bell sued Boeing in King County Superior Court for failure to accommodate, disability discrimination, and retaliation in violation of the Washington Law Against Discrimination ("WLAD"); wrongful discharge in violation of public policy; breach of contract; and declaratory relief. Dkt. No. 1-2 at 1, 5–7. Boeing timely removed the case to federal district court on diversity grounds. Dkt. No. 1. *See* 18 U.S.C. §§ 1332(a)(1), 1441(a), 1446(a)–(b). At the close of discovery, the parties filed competing motions for summary judgment.

## II.    DISCUSSION

Bell goes to great lengths to manufacture a link between two of Boeing's otherwise legitimate business decisions and his sleep disorder. As discussed below, however, there is insufficient circumstantial evidence for a reasonable jury to infer a discriminatory or retaliatory motive in Boeing's placement of Bell on unpaid medical leave and, later, its decision to terminate his employment. Because the WLAD "compensates an employer's discriminatory response, not the employee's underlying disability," Boeing is entitled to summary judgment on Bell's discrimination, retaliation, and wrongful discharge claims. *Goodman v. Boeing Co.*, 899 P.2d 1265, 1268 (Wash. 1995). Bell's breach-of-contract claim and request for declaratory relief likewise fail as a matter of law. But the Court reaches a different result with respect to Bell's reasonable accommodation claim. Because a reasonable jury could conclude that unpaid medical leave was not a reasonable accommodation in the circumstances of this case, that claim will proceed to trial.

1

**A.      Summary Judgment Standard**

2

Summary judgment is appropriate only when "the movant shows that there is no genuine

3

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4

Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

5

stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

6

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

7

sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

8

resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

9

the facts specifically averred by that party contradict facts specifically averred by the movant, the

10

motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

11

The Court will, however, enter summary judgment "against a party who fails to make a

12

showing sufficient to establish the existence of an element essential to that party's case, and on

13

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

14

(1986). Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must

15

come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

16

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))

17

(emphasis omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific

18

affidavits, *Lujan*, 497 U.S. at 888–89.

19

**B.      Washington Law Against Discrimination Claims**

20

Bell's principal claims arise under the WLAD. The Washington Legislature enacted the

21

WLAD to eliminate and prevent discrimination in employment based on, among other things, "the

22

presence of any sensory, mental, or physical disability[.]" Wash. Rev. Code § 49.60.010; *see also*

23

*Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1063–64 (Wash. 2021). The statute

24

accordingly recognizes a "right to obtain and hold employment without discrimination[.]" Wash.

Rev. Code § 49.60.030(1)(a). Any individual "deeming himself . . . injured by any act in violation of" the WLAD may bring a private action for injunctive relief and damages. Wash. Rev. Code § 49.60.030(2). The WLAD's protections are "broad," *Currier v. Northland Servs., Inc.*, 332 P.3d 1006, 1011 (Wash. Ct. App. 2014), and the Court will construe its provisions liberally, Wash. Rev. Code. § 49.60.020. *See also Martini v. Boeing Co.*, 971 P.2d 45, 55 (Wash. 1999).

"Claims arising under the WLAD are typically inappropriate for resolution at summary judgment because the WLAD mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Gamble v. City of Seattle*, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018) (cleaned up). The Court will, however, grant summary judgment against an employee if he "fails to raise a genuine issue of fact on one or more prima facie elements." *Johnson v. Chevron U.S.A., Inc.*, 244 P.3d 438, 443 (Wash. Ct. App. 2010). *See also Marquis v. City of Spokane*, 922 P.2d 43, 48 (Wash. 1996) (to survive summary judgment, the employee "must do more than express an opinion or make conclusory statements," and "must establish specific and material facts to support each element of his or her prima facie case").

### 1.   Failure to Accommodate

Bell first contends that Boeing failed to accommodate his sleep disorder. Dkt. No. 23 at 17–20. "An employer's failure to accommodate a disability constitutes discrimination unless the employer demonstrates that accommodation would result in undue hardship." *Lindblad v. Boeing Co.*, 31 P.3d 1, 3 (Wash. Ct. App. 2001). To state a claim for failure to accommodate, an employee must show that (1) he suffered from a disability; (2) he was qualified to do the job in question; (3) he gave notice of the disability to the employer; and (4) the employer failed to reasonably accommodate the disability. *LaRose v. King Cnty.*, 437 P.3d 701, 721 (Wash. Ct. App. 2019); *Slack v. Luke*, 370 P.3d 49, 54 (Wash. Ct. App. 2016).

Boeing does not dispute the second or third elements of Bell's prima facie case. As to the first element, Boeing argues half-heartedly in a footnote that it is "undisputed that Mr. Bell was never treated for or diagnosed with any sleep disorder until July 2018 and thus his condition did not meet the definition of disability." Dkt. No. 17 at 22 n.3. Not so. A disability is "a medically cognizable or diagnosable condition that exists as a record or history and that substantially limits the ability to do the job." *Callahan v. Walla Walla Hous. Auth.*, 110 P.3d 782, 787 (Wash. Ct. App. 2005). "Medically cognizable or diagnosable" is not the same as "recognized or diagnosed"; "[t]he fact that a condition has *not yet been* recognized and diagnosed does not mean it is not susceptible of recognition and diagnosis." *Id.* (emphasis original). Therefore, Bell's condition met the definition of disability. *See also Taylor v. Burlington N. R.R. Holdings, Inc.*, 444 P.3d 606, 611 (Wash. 2019) ("[T]he legislature intended to adopt a broad and expansive definition of 'disability' in order to protect against discrimination.").

The parties' spat centers on the fourth element of Bell's prima facie case. Dkt. No. 17 at 22–24; Dkt. No. 23 at 17–20. Specifically, Boeing contends that it accommodated Bell's disability by (1) postponing his transfer to third shift for 30 days and (2) placing him on unpaid medical leave "while he underwent additional testing to determine whether and to what extent he had an actual impairment that would keep him from being able to perform his job on third shift." Dkt. No. 17 at 22; *see* Wash. Rev. Code § 49.60.040(7)(d). Bell disagrees. He takes issue with the CBA's seniority provisions and suggests that Boeing could have at least attempted to identify another position instead of placing him on unpaid medical leave. *See, e.g.*, Dkt. No. 23 at 18–19; Dkt. No. 43 at 7–9. Bell argues that Boeing "did not make any effort to locate a suitable position within the company because his disability was classified by Boeing as *temporary* instead of *permanent*." Dkt. No. 43 at 7–8 ("Bell wanted Boeing to accommodate his disability whether it was in the position he held or in another position."); Dkt. No. 1-2 at 5.

1    "To accommodate, the employer must affirmatively take steps to help the employee with

2    a disability to continue working at the existing position or attempt to find a position compatible

3    with the limitations." *Frisino v. Seattle Sch. Dist. No. 1*, 249 P.3d 1044, 1049 (Wash. Ct. App.

4    2011). Although Boeing correctly asserts that it was not obligated to provide Bell his "preferred

5    accommodation," *Doe v. Boeing Co.*, 846 P.2d 531, 537 (Wash. 1993), or "reassign [him] to a

6    position that [was] already occupied, create a new position, or eliminate or reassign essential job

7    functions," *Frisino*, 249 P.3d at 1049, it was still required to "*reasonably* accommodate [his]

8    disability," *Griffith v. Boise Cascade, Inc.*, 45 P.3d 589, 593 (Wash. Ct. App. 2002) (emphasis

9    added). Put differently, Boeing was obligated to take "those steps reasonably necessary" to enable

10   Bell to perform his job. *Doe*, 846 P.2d at 537.

11   Boeing premises its resort to unpaid medical leave on the CBA. It argues that Bell's

12   requested accommodation (remaining on second shift in his current position) was "unreasonable

13   on its face" because it would have violated the CBA's seniority provisions. Dkt. No. 17 at 22; *see*

14   *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002) ("[T]o show that a requested

15   accommodation conflicts with the rules of a seniority system is ordinarily to show that the

16   accommodation is not 'reasonable.'"). The Court need not wade into those waters. Even if the

17   CBA's seniority provisions foreclosed leaving Bell in his second shift position, that does not

18   automatically render Boeing's substitute accommodation—here, unpaid medical leave—

19   reasonable. *See Steenmeyer v. Boeing Co.*, 92 F. Supp. 3d 1024, 1031 (W.D. Wash. 2015) ("The

20   fact that unpaid leave may, in certain circumstances and where requested, constitute a reasonable

21   accommodation does not mean that it cannot also be an adverse action, particularly where the

22   employee is placed on unpaid leave involuntarily."); *accord Magee v. Trader Joe's Co.*, No. 3:18-

23   CV-01956-AC, 2020 WL 9550008, at *11 (D. Or. Sept. 1, 2020); *Maya v. Leprino Foods Co.*, No.

24   C12-1479-AWI-GSA, 2014 WL 1091251, at *23 (E.D. Cal. Mar. 18, 2014). As Boeing

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 20

acknowledges, reasonable accommodation is a "flexible, interactive process," *Frisino*, 249 P.3d at 1050, which "envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions," *Goodman*, 899 P.2d at 1269–70; *see also* Wash. Admin. Code § 162-22-065(2)(c). And if an employer "fails to engage in the interactive process in good faith, [it] will face liability *if a reasonable accommodation would have been possible*." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (emphasis original) (cleaned up).

There is no evidence that Boeing made any effort to identify or direct Bell to another position matching his skill set and qualifications, such as a temporary first- or second-shift assignment, pending the outcome of additional sleep tests. *See* Dkt. No. 24-1 at 129–32. Whether this was reasonable under the circumstances is a question for the jury. *See, e.g.*, *Davis v. Microsoft Corp.*, 70 P.3d 126, 134 (Wash. 2003) ("The employer must take affirmative steps to assist the employee in the internal job search by determining the extent of the employee's disability, by inviting the employee to receive personal help from the employer's personnel office, and by sharing with the employee all job openings in the company."); *Dean v. Mun. of Metro. Seattle-Metro*, 708 P.2d 393, 399 (Wash. 1985) (employer had a duty to reasonably accommodate employee "by informing him of job openings for which he might be qualified"). Indeed, the record suggests that reassignment was at least a possibility. Boeing representatives told Bell at the June 20, 2018 interactive meeting that a permanent medical restriction from third shift "could result in placement into the reassignment process." Dkt. No. 18-1 at 248. At the same meeting, Bell informed Boeing that he was actively pursuing an Employee Requested Transfer into another Boeing organization where he could work first or second shift. *Id.*; *see also* Dkt. No. 24-1 at 129. And his doctors repeatedly reported that he was cleared for non-graveyard work. *See* Dkt. No. 24-1 at 95 (June 7, 2018: "[Bell] is medically cleared to work first and second shift."); Dkt. No. 19-1

at 55 (October 16, 2018: "[Bell] is able to work daytime shifts"); Dkt. No. 18-1 at 216, 220 (November 2, 2018: Bell is "immediately able to return to work for early or late shift, not third shift"; "he is able to work daytime shifts, operate machinery and has no physical restrictions"); Dkt. No. 19-1 at 66 (November 27, 2018: Bell is "able to work any shift in [the] daytime."). Boeing does not argue that reassignment would have imposed an undue hardship on its business.

The problem with Boeing's approach, then, was that it focused exclusively on why Bell's *preferred* accommodation (remaining in his current position) was unreasonable and failed to consider, explore, or otherwise address other available modes of accommodation (*e.g.*, temporary or permanent transfer to a different Boeing organization in a first- or second-shift position). The Court does not mean to suggest that an employer must explore every possible form of accommodation, or that it must always choose to accommodate a disabled employee by moving him or her to another position. The employer is entitled to select the mode of accommodation "to the exclusion of others" so long as that accommodation is "adequate." *Frisino*, 249 P.3d at 1050. The Court finds only that Bell has created a triable issue of fact as to whether Boeing's use of unpaid medical leave was an "adequate"—*i.e.*, reasonable—accommodation in the circumstances of this case. This is a "fact-dependent" determination "rarely amenable to bright-line rules," *Washington v. Matheson Flight Extenders, Inc.*, 440 F. Supp. 3d 1201, 1210 (W.D. Wash. 2020), which is why Washington courts ordinarily leave it to the jury. *See, e.g.*, *Pulcino v. Fed. Express Corp.*, 9 P.3d 787, 795 (Wash. 2000); *Kries v. WA-SPOK Primary Care, LLC*, 362 P.3d 974, 994–95 (Wash. Ct. App. 2015). Here too the Court declines to take the issue from the jury because there is more than "one conclusion that reasonable minds could reach." *Michelsen v. Boeing Co.*, 826 P.2d 214, 216 (Wash. Ct. App. 1991); *see Matheson*, 440 F. Supp. 3d at 1212.

2.     <u>Discriminatory Discharge and Disparate Treatment</u>

Bell next argues that Boeing terminated his employment because of his disability. Dkt. No. 23 at 15–17. The WLAD prohibits an employer from discharging an employee or otherwise discriminating against him in terms or conditions of employment because of a disability. Wash. Rev. Code § 49.60.180(2)–(3). The parties treat Bell's claim as one for discriminatory discharge and disparate treatment.[11] *See* Dkt. No. 17 at 25–26 (discussing prima facie elements of discriminatory discharge claim); Dkt. No. 23 at 16 (discussing prima facie elements of disparate treatment claim); Dkt. No. 33 at 13–14 (disparate treatment); Dkt. No. 36 at 18 (disparate treatment). The Court addresses both theories in turn.

a.     McDonnell Douglas *Burden-Shifting Framework*

Because direct evidence of discriminatory animus is rare, plaintiffs "may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action." *Mikkelsen v. Pub. Util. Dist. No. 1*, 404 P.3d 464, 470 (Wash. 2017). And where, as here, an employee does so, Washington courts employ the *McDonnell Douglas*[12] burden-shifting framework "to determine the proper order and nature of proof for summary judgment." *Scrivener v. Clark College*, 334 P.3d 541, 546 (Wash. 2014). That test places the initial burden on the employee to establish a prima facia case of discrimination. *Id.* This is "often" a "fairly low bar." *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 388 (Wash. Ct. App. 2020). If the employee can make that initial showing, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Scrivener*, 334 P.3d at 546. Finally, and only if the employer meets that

---

[11] Bell's complaint appears to contemplate both claims under a broad allegation of discriminatory conduct. He lists his third cause of action as "Disability Discrimination in violation of RCW 49.60[,]" and alleges that Boeing "discriminated against [him] based on his disability and/or perceptions of his disability." Dkt. No. 1-2 at 6; *see also* Dkt. No. 23 at 15 ("Boeing engaged in two discrete forms of discrimination: 1) [Bell] was discriminated against and terminated from employment due to his disability and 2) Boeing failed to accommodate his disability.").

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

burden, the employee must produce sufficient evidence to show that the employer's purported

nondiscriminatory reason for the adverse employment action was pretextual. *Id.* Despite the

*McDonnell Douglas* burden-shifting framework, the ultimate burden of persuasion remains with

the plaintiff to show that the defendant employer intentionally discriminated or retaliated against

him. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

b.     *Discriminatory Discharge*

An employee establishes a prima facie case of discriminatory discharge by showing that

he was (1) within a statutorily protected class; (2) discharged by his employer; and (3) doing

satisfactory work. *Mikkelsen*, 404 P.3d at 470. Boeing appears to concede—or at least does not

directly dispute—that Bell satisfies these three elements. *See* Dkt. No. 17 at 25–27 (addressing

only second and third steps of *McDonnell Douglas* framework). Bell has therefore established a

prima facie case of discriminatory discharge. *See, e.g.*, *Aragon v. Republic Silver State Disposal,*

*Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (only a "minimal inference" is needed to establish prima

facie case); *Shaffstall v. Old Dominion Freight Line, Inc.*, __ F. Supp. 3d __, No. C18-1656-JCC,

2020 WL 1515621, at *6 (W.D. Wash. Mar. 30, 2020) (same). His claim, however, does not

survive the remainder of the *McDonnell Douglas* burden-shifting framework.

Boeing offered a "legitimate, nondiscriminatory reason" for Bell's discharge: job

abandonment. Dkt. No. 17 at 26. *See Frisino*, 249 P.3d at 1053 (failure to return to work is a

nondiscriminatory reason for termination). The employer's burden "is merely one of production,

rather than persuasion," and it "need only introduce 'evidence which, *taken as true*, would *permit*

the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Mikkelsen*, 404

P.3d at 473–74 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Boeing has

satisfied that standard here. The burden therefore shifts back to Bell.

1    To survive summary judgment, he must produce "sufficient evidence to create a genuine

2    issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the

3    employer's stated reason is legitimate, discrimination nevertheless was a substantial factor

4    motivating the employer." *Scrivener*, 334 P.3d at 546. Bell does neither.

5    An employer's proffered nondiscriminatory reason is pretextual if it (1) has no basis in

6    fact, (2) was not really a motivating factor for the decision, (3) was not temporally connected to

7    the adverse employment action, or (4) was not a motivating factor in employment decisions for

8    other employees in the same circumstances. *Id.* at 546–47. Bell makes no effort to place Boeing's

9    nondiscriminatory reason into any of these pretextual categories. Nor has he produced evidence

10   sufficient for "a reasonable jury [to] find that discrimination was a substantial factor" in Boeing's

11   decision to terminate him. *Mikkelsen*, 404 P.3d at 471. Bell instead advances a series of convoluted

12   allegations to manufacture a link between his termination and disability.

13   Specifically, Bell asserts that Watterson's "only problem" with him was his "desire to have

14   Boeing honor the promise it made when it hired him and to refrain from a transfer that would

15   violate his medical restrictions." Dkt. No. 23 at 16. He further claims that:

16   - Watterson "attempted to label him as being unsuitable for Boeing";

17   - Frederick Bell "threatened" him with termination when he refused to sign the shift
18     transfer memo;

19   - the director of Boeing's Emergent Operations "questioned" his need for a
20     temporary accommodation;

21   - Watterson impliedly questioned the veracity of his disability;

22   - Boeing placed him on an unpaid medical leave of absence; Watterson expressed
23     joy ("It's a good day!") when Reed Group denied his leave request in January 2019;
24     and, finally,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 25

- Watterson wrote in an email that it was "unconscionable and incredibly unethical to continue to allow [Bell] to hijack [Boeing's] processes and make a mockery of our company."

Dkt. No. 23 at 16–17.

These assertions do not amount to the "specific and substantial evidence" required to challenge the credibility of Boeing's motives. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998) (the employee must show that the employer's proffered motives are "not believable"). The dispositive question is whether job abandonment was "the actual reason for [Bell's] termination." *Mackey*, 459 P.3d at 387. The uncontested facts establish that this is so. Bell's short-term disability benefits expired once he stopped submitting the requisite supporting medical documentation to the Reed Group. Boeing then directed him to return to work or submit a new accommodation request. Bell did neither. And when Bell failed to report to work, Boeing terminated him for job abandonment. *See* Dkt. No. 24-1 at 181, 188. Nothing in the record indicates that job abandonment was an unsubstantiated pretext for a more insidious or discriminatory motive. Nor does the evidence relied on by Bell suggest that discriminatory animus was a "substantial factor" motivating the otherwise neutral decision to terminate him for job abandonment. Boeing is entitled to summary judgment on Bell's claim for discriminatory discharge.

### c.   *Disparate Treatment*

Bell's disparate treatment claim fails on the same grounds. To establish a prima facie case of disparate treatment, an employee must show that he was (1) disabled; (2) subject to an adverse employment action; (3) doing satisfactory work; and (4) discharged under circumstances that raise a reasonable inference of discrimination. *Callahan*, 110 P.3d at 786; *Anica v. Wal-Mart Stores, Inc.*, 84 P.3d 1231, 1236 (Wash. Ct. App. 2004). Other than his termination from Boeing, the only

possibly adverse action Bell points to is his placement on unpaid medical leave. Dkt. No. 23 at 15, 17. The Court assumes without deciding for purposes of this claim that Boeing's placement of Bell on unpaid medical leave was an adverse employment action. It likewise assumes without deciding that he has presented a prima facie case of disparate treatment. Even so, his claim ultimately fails under the *McDonnell Douglas* framework.

Boeing alleges that it placed Bell on unpaid medical leave as a temporary accommodation "while he underwent additional testing to determine whether and to what extent he had an actual impairment[.]" Dkt. No. 17 at 22. This is a "legitimate, nondiscriminatory reason for the adverse employment action." *Scrivener*, 334 P.3d at 546. Bell must therefore present evidence that this reasoning was pretextual, or that discrimination was nonetheless a "substantial factor" in Boeing's decision to place him on unpaid medical leave. *Id.* Bell has not met this burden. Here again his reliance on internal Boeing emails is unavailing. *See* Dkt. No. 23 at 16–17. And here again he fails to articulate a cogent argument explaining how these emails demonstrate that Boeing's otherwise legitimate business decision is "unworthy of credence," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981), or "merely a pretext masking intentional discrimination," *Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1213 (W.D. Wash. 2018).

Nor does the record suggest that discriminatory animus towards Bell's sleep disorder played a "substantial" role in Boeing's decision to place him on unpaid medical leave. *See Shokri*, 311 F. Supp. 3d at 1214 ("The statements in *Scrivener* were directly indicative of a discriminatory animus towards Ms. Scrivener's protected class and were statements from which the jury could directly infer intent to discriminate against older applicants by not hiring them."). In Watterson's "New Employee Progress/Probationary Review" of Bell on June 12, 2018—well after Bell notified Boeing that his disability would prevent him from working third shift—Watterson stated that Bell was "[p]rogressing [s]atisfactorily." Dkt. No. 24-1 at 233. It was not until Bell made "bombastic,

1    loud and argumentative" comments during the review meeting that Watterson reconsidered

2    whether Bell should be retained. *Id.* at 231–32 (Watterson could not "with a clear conscience"

3    recommend Bell for retention because of his "blatant disrespect for managerial authority" and the

4    difficulty of dealing with him "when a disagreement arises"). There is no indication that

5    Watterson's comments were discriminatory. The remaining emails between Boeing

6    representatives at best evince general dislike for Bell and an annoyance with his apparent

7    "outburst[s]" and disruptive behavior. *See, e.g.*, Dkt. No. 24-1 at 111–12; *Shokri*, 311 F. Supp. 3d

8    at 1220–21 (although "[t]he record as a whole certainly shows a clash of personalities between

9    Plaintiff and his new manager," the court's "role is to remedy discrimination, not to assume the

10   role of a super personnel department, assessing the merits—or even the rationality—of employers'

11   nondiscriminatory business decisions." (cleaned up)).

12         Bell's cursory mention of his encounter with Frederick Bell is likewise insufficient to save

13   this claim from summary judgment. That Frederick Bell "threatened [him] with termination when

14   he refused to sign a shift transfer" does not demonstrate a discriminatory animus towards his

15   disability or suggest that discriminatory motives played a role in Boeing's decision to place him

16   on unpaid medical leave. Bell fails to supply the Court with cogent argument or otherwise expound

17   on the "evidence" of Boeing's discrimination that he presents in conclusory fashion. *See* Dkt. No.

18   23 at 16–17. And even assuming that it advanced his position, it would amount to "slight

19   evidence—a scintilla" that does not meet his "burden of presenting specific and substantial

20   evidence that [Boeing] intentionally discriminated against him[.]" *Shokri*, 311 F. Supp. 3d at 1214;

21   *Callahan*, 110 P.3d at 786 ("In general, the plaintiff must produce sufficient evidence to enable a

22   jury to find that the adverse employment action was, more likely than not, the result of unlawful

23   discrimination."). Boeing is entitled to summary judgment on this claim as well.

24

1          3.    <u>Retaliation</u>

2          Bell next claims that Boeing retaliated against him for requesting an accommodation by

3    placing him on unpaid medical leave and, eventually, discharging him. Dkt. No. 23 at 20–21; Dkt.

4    No. 36 at 20–22. An employer may not discharge or otherwise discriminate against an employee

5    for opposing a practice forbidden by the WLAD. Wash. Rev. Code § 49.60.210(1). An employee

6    establishes a prima facie case of retaliation by showing that (1) he took a statutorily protected

7    action; (2) he suffered an adverse employment action; and (3) a causal link exists between his

8    protected activity and the adverse employment action. *Cornwell v. Microsoft Corp.*, 430 P.3d 229,

9    234 (Wash. 2018). The *McDonnell Douglas* framework applies to retaliation claims. *Mackey*, 459

10   P.3d at 381.

11              a.    *Bell Engaged in Protected Activity*

12         Boeing contends that Bell's claim fails at the outset because he did not take a statutorily

13   protected action. *See, e.g.*, Dkt. No. 17 at 28; Dkt. No. 33 at 20. The Court disagrees. Bell's request

14   for an accommodation was a statutorily protected action. *Hansen v. Boeing Co.*, 903 F. Supp. 2d

15   1215, 1218 (W.D. Wash. 2012); *Daniel v. Boeing Co.*, 764 F. Supp. 2d 1233, 1245 (W.D. Wash.

16   2011).

17              b.    *Bell Suffered an Adverse Employment Action*

18         As for the second prima facie element, Bell alleges several adverse employment actions.

19   *See* Dkt. No. 23 at 20–21. Not all qualify. Termination is an adverse employment action and, as

20   discussed above, a reasonable jury could conclude that unpaid medical leave is as well. *See*

21   *Steenmeyer*, 92 F. Supp. 3d at 1031; *Magee*, 2020 WL 9550008 at *11. But the other incidents fail

22   as a matter of law.

23         Bell appears to advance a series of internal Boeing emails as adverse actions. *See* Dkt. No.

24   23 at 20–21. These include Watterson's characterization of him as "combative," "rude," and

"belligerent"; a director's displeasure that Bell received a 30-day temporary accommodation and unpaid medical leave ("Why would we agree to this? I wanted to be kept in the loop and wasn't."); Watterson's joy when Boeing terminated Bell ("It's a good day!"); and Watterson's statement that Bell was making a "mockery" of Boeing. *See* Dkt. No. 23 at 20–21; Dkt. No. 18-1 at 248; Dkt. No. 24-1 at 112, 185, 231–32, 241. Bell also points to Frederick Bell's termination threat as an adverse employment action. Dkt. No. 23 at 20–21.

These incidents are not "tangible adverse employment action[s]." *Marin v. King Cnty.*, 378 P.3d 203, 212 (Wash. Ct. App. 2016). Washington courts have long made clear that the WLAD is not a "general civility code," and "not everything that makes an employee unhappy is an actionable adverse action." *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 617 (Wash. Ct. App. 2013); *see, e.g.*, *Kirby v. City of Tacoma*, 98 P.3d 827, 837 (Wash. Ct. App. 2004) ("insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not adverse employment actions); *Boyd v. State*, 349 P.3d 864, 870 (Wash. Ct. App. 2015) (mere "inconveniences" do not qualify). Indeed, even actions that are "disciplinary or investigatory in nature" do not suffice. *Kirby*, 98 P.3d at 833; *Tyner v. State*, 154 P.3d 920, 929 (Wash. Ct. App. 2007). For an action to be adverse, it must amount to a "significant change in employment status," such as "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

An action will be considered "adverse" if it is "reasonably likely to deter employees from engaging in protected activity." *Daniel*, 764 F. Supp. 2d at 1246 (internal quotation marks and citation omitted); *accord Boyd*, 349 P.3d at 870. "Context matters," and "[w]hether a particular [action] is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position[.]'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 71 (2006) (quoting *Oncale v. Sundowner Offshore*

*Serv., Inc.*, 523 U.S. 75, 81 (1998)). Bell glosses over the fact that he was not privy to the emails until discovery, long after his discharge from Boeing. The emails therefore would not have dissuaded a reasonable employee in his shoes (with no knowledge of the emails) from making or supporting a charge of discrimination. Nor did they alter the conditions of his employment. *See Barton v. Zimmer, Inc.*, No. 1:06-CV-208-TS, 2009 WL 10692051, at *25 (N.D. Ind. July 16, 2009) ("before actions can be said to have the likely effect of dissuading a reasonable employee from making a charge of discrimination, these actions must be known to the employee who is claiming the dissuasive impact"; "[a]n action of which an employee is unaware and which does not create harm cannot be a deterrence.").

Frederick Bell's threatening remarks likewise fall short. True, a reasonable jury could find that Frederick Bell's behavior—threatening Bell with termination if he did not sign a shift transfer memo—would dissuade a reasonable worker in Bell's shoes from requesting an accommodation. But that does not end the inquiry. Frederick Bell's actions did not amount to a "significant change" in Bell's employment status; indeed, they had no effect on Bell's employment status whatsoever. As Boeing notes, the Shift Change and Temporary Move Memo was not an agreement or acquiescence to transfer. Dkt. No. 42 at 7–8; Dkt. 24-1 at 109. It was formal notice of a unilateral decision that Boeing had already made based on the CBA's seniority provisions. Dkt. No. 42 at 7–8. Bell's signature thus had no effect on the terms of his employment. And, in any event, Boeing had at that point already indicated to Bell that it would place him on unpaid medical leave at the expiration of his 30-day temporary accommodation.

      c.      *Bell's Retaliation Claim Fails Under the Pretext Step of the McDonnell Douglas Framework*

The Court assumes without deciding that Bell can establish the third and final prima facie element: a causal link between his protected activity and both adverse employment actions. The

1    Court, however, expresses doubt as to whether Bell meets this "fairly low" bar. *Mackey*, 459 P.3d

2    at 388; *see Cornwell*, 430 P.3d at 235 (to prove the causal element, a plaintiff must show that

3    retaliation was a "substantial factor" motivating the employer's adverse action); *Currier*, 332 P.3d

4    at 1013 ("[R]etaliation need not be the main reason behind the [adverse action] but instead need

5    only be the reason that 'tips the scales' toward [it]." (quoting *Wilmot v. Kaiser Aluminum & Chem.*

6    *Corp.*, 821 P.2d 18, 31 (Wash. 1991))). Nonetheless, Washington Courts have repeatedly held that

7    a plaintiff satisfies the causation element when "(1) the employee took a protected action, (2) the

8    employer had knowledge of the action, and (3) the employee was subjected to an adverse

9    employment action." *Cornwell*, 430 P.3d at 235 (emphasis omitted); *Currier*, 332 P.3d at 1013;

10   *Kahn v. Salerno*, 951 P.2d 321, 332 (Wash. Ct. App. 1998); *Graves v. Dep't of Game*, 887 P.2d

11   424, 427 (Wash. Ct. App. 1994).[13] Bell has done that here.

12        Even so, Bell's retaliation claim goes no further. As discussed above, Boeing has proffered

13   "legitimate, nondiscriminatory, nonretaliatory reason[s]" for placing Bell on unpaid medical leave

14   and, eventually, terminating his employment. *Renz v. Spokane Eye Clinic, P.S.*, 60 P.3d 106, 109

15   (Wash. Ct. App. 2002). Bell has failed to rebut these legitimate explanations. To the extent he

16   relies on the Boeing emails and Frederick Bell's threats to prove pretext, his reliance is

17

---

18   [13] On the other hand, however, Washington courts have looked to "the employer's knowledge of the protected activity
     and the proximity in time between that activity and the termination" to evaluate causation. *Mackey*, 459 P.3d at 384;

19   *Vasquez v. State*, 974 P.2d 348, 353 (Wash. Ct. App. 1999) ("Among the factors suggesting retaliatory motivation is
     proximity in time between the discharge and the protected activity; another factor is satisfactory work performance

20   and evaluations."). Bell would likely fail to establish causation under these factors with respect to termination because
     he was discharged ten months after requesting a reasonable accommodation, and only after he stopped submitting the
     necessary paperwork to maintain his leave. He would, however, likely establish causation with respect to unpaid

21   medical leave. *See Wilmot*, 821 P.2d at 29 ("Discharge some length of time after the employee's [protected activity]
     will be less likely to reflect an improper motive[.]"); *compare Ellorin v. Applied Finishing, Inc.*, 996 F. Supp. 2d 1070,

22   1091 (W.D. Wash. 2014) (eight months between protected activity and adverse employment action was insufficient
     to establish temporal proximity), *with Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1383 (W.D. Wash. 2019) (one
     month between protected activity and adverse employment action was sufficient proximity to establish causation),

23   *Mackey*, 459 P.3d at 384 (termination occurred "just 12 days" after employee engaged in protected behavior), *and
     Estevez v. Fac. Club of Univ. of Wash.*, 120 P.3d 579, 590, 591 (Wash. Ct. App. 2005) (termination occurred nine

24   days after employee engaged in protected activity).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 32

1   unavailing—especially at the pretext stage of the *McDonnell Douglas* analysis. *See Mackey*, 459

2   P.3d at 387–88 (distinguishing the "fairly low" burden of establishing a causal connection for

3   purposes of the third prima facie element from the heightened burden of presenting evidence

4   sufficient to show pretext under *McDonnell Douglas*'s third step).

5        This evidence does not demonstrate that Boeing's decisions were driven, even in part, by

6   a retaliatory motive. *See Shokri*, 311 F. Supp. 3d at 1222 ("Plaintiff presents no evidence that

7   Defendant's actions were actually driven by retaliatory intent."); *Hedenburg v. Aramark Am. Food

8   Servs., Inc.*, 476 F. Supp. 2d 1199, 1209 (W.D. Wash. 2007) ("Hedenburg has simply not provided

9   any evidence showing a retaliatory motive on the part of Aramark."). Nor does Bell do much to

10  elaborate on or otherwise advance his argument beyond pointing to the email exchanges and

11  threats as ipso facto proof of retaliation. For instance, he fails to explain how Frederick Bell's

12  termination threats, which occurred after Boeing made the decision to place him on unpaid medical

13  leave, render that decision retaliatory. The Court is likewise strained to find material significance

14  in the emails exchanged between Boeing management, which discuss the legitimate procedure

15  Boeing had to follow (and for how long) in order to accommodate Bell's disability. Although

16  certain emails are at times tinged with personal opinions of Bell, they do not render Boeing's

17  otherwise legitimate business decisions pretextual or suggest that retaliation was a substantial

18  factor in those decisions.

19       The outcome is the same with respect to Bell's termination. The Court has already

20  discussed why the record is insufficient to create a competing inference of discriminatory or

21  retaliatory intent. The undisputed facts establish that Boeing terminated Bell for job abandonment

22  once his short-term benefits expired and he failed to return to work. Neither the emails nor

23  Frederick Bell's threats call that into question in the slightest degree. Indeed, even if the Court

24  found the evidence sufficient to create a competing inference, Bell's "entire case, with regard to

both discrimination and retaliation, [would be] built upon inference." *Shokri*, 311 F. Supp. 3d at 1223. And while he is "entitled to all reasonable inferences from the evidence, at some point, the reasonable jury cannot continue inferring without actual evidence." *Id*.

Given the "totality of the circumstances," this case does not present the "close call" necessary to submit the issue of pretext to a jury. *See Matson v. United Parcel Serv., Inc.*, 872 F. Supp. 2d 1131, 1144 (W.D. Wash. 2012). The evidence to which Bell points simply would not permit a reasonable jury to conclude that Boeing's decisions to place Bell on unpaid medical leave and, later, terminate him were pretextual excuses concealing retaliatory motives, or that retaliation was a substantial factor in those decisions. Boeing is therefore entitled to summary judgment on Bell's retaliation claim. *See McElwain v. Boeing Co.*, 244 F. Supp. 3d 1093, 1098 (W.D. Wash. 2017) (employer was entitled to summary judgment because employee failed to rebut alternative explanation for adverse employment action); *Moba v. Total Transp. Servs. Inc.*, 16 F. Supp. 3d 1257, 1268 (W.D. Wash. 2014) (same); *Hedenburg*, 476 F. Supp. 2d at 1209 (same).

## C.    Wrongful Termination in Violation of Public Policy

Boeing moves, apparently unopposed, for summary judgment on Bell's claim for wrongful termination in violation of public policy.[14] Dkt. No. 1-2 at 5. In Washington, "[a]n employer may discharge an at-will employee for 'no cause, good cause or even cause morally wrong without fear of liability.'" *Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 257 P.3d 586, 594–95 (Wash. 2011) (quoting *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1085 (Wash. 1984)). But a narrow

---

[14] Bell does not move for summary judgment on this claim, contest Boeing's motion for summary judgment on this claim, or otherwise mention this claim anywhere in his briefing. *See* Dkt. No. 23 (motion for summary judgment); Dkt. No. 36 (opposition to Boeing's motion for summary judgment); Dkt. No. 43 (reply in support of motion for summary judgment). This, according to Boeing, means that the Court should treat the claim as "conceded" and dismiss it. Dkt. No. 42 at 3–4. The Court disagrees. The non-moving party's failure to respond to arguments made in the motion does not constitute a complete abandonment of its opposition to summary judgment. *Gustafson-Feis v. Reliance Life Ins. Co.*, 535 F. Supp. 3d 1076, 1078 n.2 (W.D. Wash. 2021); LCR 7(b)(2). *See also Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (Federal Rule of Civil Procedure 56(e) prohibits summary judgment by default even if there is a complete failure to respond to the motion).

exception to the at-will employment doctrine prohibits an employer from terminating an employee "for reasons that contravene a clear mandate of public policy." *Mackey*, 459 P.3d at 381 (cleaned up); *see also Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015).

Courts have generally limited public policy tort actions to situations in which the employee is discharged for (1) refusing to commit an illegal act, such as engaging in price fixing; (2) performing a public duty or obligation, such as serving jury duty; (3) exercising a legal right or privilege, such as filing a workers' compensation claim; or (4) engaging in "whistleblowing" activity. *Dicomes v. State*, 782 P.2d 1002, 1006–07 (Wash. 1989). If an employee's public policy tort action falls into one of the four *Dicomes* categories, he establishes a prima facie case of wrongful discharge in violation of public policy by showing that (1) his discharge may have been motivated by reasons that contravene a clear mandate of public policy; and (2) his public-policy-linked conduct was a significant factor in the decision to discharge him.[15] *Mackey*, 459 P.3d at 384; *Martin v. Gonzaga Univ.*, 425 P.3d 837, 844 (Wash. 2018). The *McDonnell Douglas* burden-shifting framework applies here, too. *Mackey*, 459 P.3d at 381; *Martin*, 425 P.3d at 844–45.

Bell's claim falls into the third category. He alleges that Boeing discharged him for requesting reasonable accommodation, *i.e.*, exercising a legal right. *See, e.g.*, Dkt. No. 36 at 22 ("Boeing made an example of [Bell] for asserting his rights under the WLAD[.]"). The WLAD sets forth an "explicit, well-defined, and dominant public policy." *Int'l Union of Operating Eng'rs, Loc. 286 v. Port of Seattle*, 295 P.3d 736, 740 (Wash. 2013). *See* Wash. Rev. Code §§ 49.60.010, 49.60.030(1)(a). Bell fails to make out a prima facie case, however, because he has not submitted

---

[15] When, however, the employee's claim does not fit neatly into one of the *Dicomes* categories, Washington courts instead evaluate the claim under a four-part test. *Martin v. Gonzaga Univ.*, 425 P.3d 837, 843 (Wash. 2018); *Mackey*, 459 P.3d at 385 n.4. In those cases, an employee must show (1) the existence of a clear public policy; (2) that discouraging the conduct in which he engaged would jeopardize the public policy; (3) that his public-policy-linked conduct caused the termination; and (4) that the employer cannot offer an overriding justification for the termination. *Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 382 (Wash. 1996).

1    evidence sufficient to show that his discharge may have been motivated by reasons that contravene

2    that policy. Nor, for reasons already discussed, can he show that his public-policy-linked conduct

3    was a significant factor in Boeing's decision to terminate his employment. Boeing is entitled to

4    summary judgment on this claim.

5    **D.     Breach of Contract and Promissory Estoppel**

6          Although Bell's complaint alleges a breach-of-contract claim, Dkt. 1-2 at 6–7, he now

7    moves for summary judgment on a theory of promissory estoppel. Dkt. No. 23 at 21–22; Dkt. No.

8    36 at 22–24; Dkt. No. 43 at 12–13. Bell's complaint makes no mention of promissory estoppel,

9    and he cannot now "turn around and surprise" Boeing at the summary judgment stage with a new

10   theory of recovery. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000); *see*

11   *also U.S. Bank, N.A. v. Glogowski Law Firm, PLLC*, No. C19-0074-JCC, 2021 WL 3375942, at

12   *6 (W.D. Wash. Aug. 2021) (party could not move for summary judgment on an indemnification

13   allegation that it did not make in its amended complaint).

14         Boeing is in any event entitled to summary judgment on Bell's breach-of-contract claim.[16]

15   A breach-of-contract claim requires the plaintiff to show that (1) a valid agreement existed between

16   the parties; (2) the agreement was breached; and (3) the plaintiff was damaged. *Univ. of Wash. v.*

17   *Gov't Emps. Ins. Co.*, 404 P.3d 559, 566 (Wash. Ct. App. 2017). Boeing vehemently denies that

18   its November 3, 2017 contingent offer letter constitutes an enforceable contract. Dkt. No. 17 at

19   29–30; Dkt. No. 47 at 8–9. *See Storti v. Univ. of Wash.*, 330 P.3d 159, 163 (Wash. 2014) (the "first

20   question" is "whether an enforceable contract has been created"). The Court, however, assumes

21

22

23

24

---

[16] Bell's briefing focuses exclusively on a promissory estoppel theory and makes no mention of his original breach-of-contract claim. *See* Dkt. No. 23 at 14–23 (motion for summary judgment); Dkt. No. 36 at 12–24 (opposition to Boeing's motion for summary judgment); Dkt. No. 43 at 5–13 (reply in support of motion for summary judgment). Although Boeing contends that the claim is therefore "conceded," Dkt. No. 42 at 3–4, the Court disagrees for reasons discussed in footnote 14.

without deciding that Boeing's contingent offer letter and Bell's acceptance of that offer formed a valid contract. The Court also assumes without deciding that Bell did not assent to the CBA provisions and, accordingly, that none of those provisions formed part of the parties' agreement.[17] *See Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 492 (Wash. 2020).

Even so, Boeing did not breach the terms of that agreement by transferring Bell to third shift. At-will employment is the default in Washington, *Roe*, 257 P.3d at 594, and "[a]n at-will employee may quit or be fired for any reason," *Danny v. Laidlaw Transit Servs., Inc.*, 193 P.3d 128, 131 (Wash. 2008). Boeing's contingent offer letter does not specify a length of time for Bell's employment. Dkt. No. 24-1 at 90–93. Bell was therefore an at-will employee (a designation that he does not otherwise contest) and Boeing was free to terminate him at any time with or without cause. *See Baker v. City of SeaTac*, 994 F. Supp. 2d 1148, 1159 (W.D. Wash. 2014) ("[A]n offer letter does not need to specify at-will employment in order for at-will employment to apply."); *see also Greaves v. Med. Imaging Sys., Inc.*, 879 P.2d 276, 278 (Wash. 1994). As Boeing suggests, the ability to unilaterally transfer Bell to whatever position it pleased was incidental to its right to terminate Bell for "no cause, good cause or even cause morally wrong without fear of liability." *Thompson*, 685 P.2d at 1085; *see* Dkt. No. 47 at 8–9.

Bell's breach-of-contract claim looks instead like a claim of wrongful transfer, a cause of action that Washington courts have refused to recognize. *See White v. State*, 929 P.2d 396, 407–08 (Wash. 1997); *Bricker v. Jackpot Convenience Stores, Inc.*, 98 Wash. App. 1034, 1999 WL 1211452, at *10 (1999) (unpublished). As the court explained in *White*, a "broad 'bad faith' exception to the employment-at-will rule" would imply "a covenant of good faith and fair dealing

---

[17] Bell briefly mentions oral communications between himself and a Boeing recruiter. Dkt. No. 23 at 21; Dkt. No. 24-1 at 9–10. But a party cannot rely on oral representations when there is a plain and unambiguous written agreement. *Wash. Fed. Sav. & Loan Ass'n*, 266 P.3d 905, 909 (Wash. Ct. App. 2011).

in every employment contract" and "would be too great an intrusion into the employment relationship." 929 P.2d at 407. Moreover, subjecting every decision of the employer to judicial scrutiny does "not strike the proper balance between the employer's right to run [its] business as [it] sees fit and the employee's right to job security," especially when the employee's rights are already protected by civil rights statutes. *Id.* at 408. Finally, to the extent that Bell's breach-of-contract claim is premised on Boeing's alleged violations of the WLAD, it fails as a matter of law. *See Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 215 (Wash. 2018) ("To bring a claim for breach of contract, a party must point to a separate duty contained in the contract that is different from the duties already imposed by law on the parties.").

## E.    Declaratory Relief

Bell's complaint last seeks a declaration "that he is not required to repay [Boeing] for his relocation expenses since [it] failed to accommodate his disability, . . . breached [its] contractual duties to [him], retaliated against him based on his insistence that [it] adhere to [its] legally required duties and terminated him in violation of public policy." Dkt. No. 1-2 at 7. He asks the Court "to find that Boeing is obligated to provide the shift and working conditions it promised to avoid an injustice and to declare that [Bell] is not obligated to repay his relocation expenses." Dkt. No. 23 at 23. Boeing counters that "[e]ven if Mr. Bell could establish any of his claims—which he cannot—none of his claims represent a valid defense to the enforceability of the Relocation Agreement." Dkt. No. 17 at 30.

Under the Relocation Repayment Agreement, Bell agreed to repay Boeing "all lump sum payments, reimbursements, recurring allowances, third party payments, and any tax gross-up amounts for Relocation Expenses" if, within twelve months of the effective date of his hire, he was "involuntarily terminated for a reason other than a reduction in work force[.]" Dkt. No. 24-1 at 72. Bell's effective hire date was April 20, 2018. Dkt. No. 20-1 at 2. Boeing terminated him for

job abandonment on March 22, 2019. Dkt. No. 18-1 at 268–69. He was therefore "involuntarily terminated for a reason other than reduction in work force" within twelve months of his hire date and must now repay all relocation expenses. *See Lehrer v. State*, 5 P.3d 722, 726 (Wash. Ct. App. 2000) (the court must enforce a contract as written when it is "clear and unambiguous").

Bell's bid for declaratory relief essentially asks the Court to void an otherwise valid and enforceable contract. Even if Bell prevails at trial on his reasonable accommodation claim, the four corners of the Relocation Repayment Agreement remain untouched. A verdict in his favor would not alter the fact that he was "involuntarily terminated for a reason other than reduction in work force" within twelve months of his effective hire date. To the extent that Bell's request for declaratory relief is premised on Boeing's alleged violations of the WLAD, other avenues exist for recovering any damages that Bell sustained as a result of such alleged violations. *See* Wash. Rev. Code § 49.60.030(2) (successful plaintiffs may "recover the actual damages sustained by the person . . . together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by [the statute] or the United States Civil Rights Act of 1964 as amended").

### III.   CONCLUSION

For the foregoing reasons, the Court:

1. GRANTS IN PART and DENIES IN PART Boeing's Motion for Summary Judgment by granting Boeing's motion as to Bell's discriminatory discharge, disparate treatment, retaliation, wrongful termination in violation of public policy, breach of contract, promissory estoppel, and declaratory judgment claims; and denying the motion as to Bell's failure to accommodate claim; and

2. DENIES Bell's Motion for Summary Judgment.

1    Dated this 20th day of April, 2022.

2

3                                                Lauren King
                                                 United States District Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24